CONNOR and WALKER, JJ., dissenting. *Page 530 
The prisoner was convicted in May last of the murder of his wife, on 24 February, 1906. The evidence was plenary. He came to the house of his wife between 11 and 12 o'clock at night, (677) when she was in bed, as were her six children, the youngest five years old, four of them girls, and the oldest a girl about 17, and all sleeping in the same room. The oldest boy testified that he was waked up between 11 and 12 o'clock by his father's voice, who upbraided his mother about a deed he had made her for the property. When she refused to discuss the matter he ran to the bedside and attacked her in the presence of her children, who tried to shield her and to hold him back, but in vain. He threatened to shoot them, and when the terrified children relaxed their hold and were run out of the house by him, he dragged his wife out of bed and shot her. This boy was just 15 years old. The prisoner had beaten his wife before, and had been put under a peace bond. A neighbor who heard the screams and pistol shot, hurried over to the house, when the prisoner, who was standing in the room where his wife lay shot and dying, met him in the hallway, and, pointing his pistol at witness' head, told him not to come in. The children were all out in the yard in their night-clothes, screaming. The witness went to get an officer, and when he got back the prisoner had fled. The dead body of prisoner's wife, with the bedclothes wrapped around her waist, was then lying with her head on the hearth and feet on the floor. She had been shot in the side. The prisoner rode in a street car to the vicinity of his wife's house, got off and went in that direction, and soon the pistol shot was heard. Several testified that if the prisoner was then under the influence of liquor it was not perceptible; he seemed sober. After the homicide his employer, Mr. Houston, went to see him, told him he was sorry he had gotten into this trouble, and asked him "why he had done as he did. He said he had been treated wrong. I asked him if he was drinking. He said no, he had drunk nothing before he went there, but something after he left. I then asked is he was not sorry for what he had done. He said no, that he was glad of it, and that he had been treated wrong: his *Page 531 
property had been taken from him and he had been kicked out of doors; that he had studied over the matter and planned it (678) for some time." The same witness saw him again and asked, in the presence of the jailer, "if he regretted what he had done. He said no, that he was glad of it; that he had been treated wrong, his property had been taken from him, that he had been kicked out of his own house and that he could not stand it any longer." When asked if he was not afraid he might be hung, he said "he didn't care, and was ready to pay the penalty; that he hoped they would hang him; that he was ready to hang then." When the coroner went to see the prisoner he looked up and asked: "Is she dead?" When told she was, he said: "Then I am satisfied." W. T. Riggsbee, who was with the coroner, cautioned him to keep silent, that he would regret it, but he replied that "he would not, and that he had thought over the matter for five weeks." When asked when he got the pistol, he said a few days ago, and when asked if it was not since Thursday (the homicide was an Saturday night), he said "Yes" — said he got the pistol from a friend, but when asked the name of his friend, said he had forgotten.
Mr. Hamlet testified that about 10 o'clock the night of the homicide he saw the prisoner buy a pistol, who asked if the pistol would "shoot strong." When told that it would, he said he "would try it next day, and if it did not shoot strong he would bring it back."
The oldest daughter, aged 17 years, testified substantially to the same state of facts as her brother; that they were all asleep in the same room, she and one of her sisters in bed with her mother, when she was awakened by the prisoner's voice; he was standing in the floor, and told his wife to get up, that he "wanted to talk with her." He again told her to get up and said: "I am going to live in this house in spite of you and Lawyer Manning." He again told her to get up. She told him she was sick and to get away, she could not stand to talk to him. He was then sitting upon the side of the bed; he immediately pulled his pistol out and said: "You can't stand it? See if (679) you can stand this."
The witness tried to get between the pistol and her mother's head, when the prisoner told her to "Get up, or I will shoot you," whereupon the prisoner took hold of his wife's feet, jerked her out of bed and dragged her to the hearth. When his daughter started to them, prisoner pushed her to the door and then, with his wife in one of his arms, shot her in the side. She said her younger sister offered to fix her father a place to lie down, when they first woke up; he declined and said: "I wouldn't lay down in this house five minutes for $1,000." She says *Page 532 
that before she went to bed she fastened all the doors, except the back door, which her mother said that she had fastened.
The prisoner and his wife had separated and were not living together. The sole evidence introduced for prisoner was that of some witnesses who testified that he was drinking on his way to his wife's house that night. The only exception to be considered (for though there were others, they were merely formal and are without merit, and though not expressly abandoned, are not in the brief) is the following, as stated by the Judge: "The prisoner, when the jury were impaneled, through his counsel, moved that witnesses be sent out and separated. The motion was granted. The State's witnesses were sworn and sent out of the courtroom, and the witnesses were also sworn for the prisoner and sent out of the court-room. On the first day of the trial prisoner's counsel talked with the witness, W. T. Riggsbee, and learned of his testimony, but did not put him under subpoena until to-day, second day of the trial. Both before and after the witness was subpoenaed, counsel for prisoner permitted the witness to stay in the court-room, without having him sworn or calling the Court's attention to the matter, until they called him to the stand. The State objected to the witness; objection sustained, and prisoner excepted."
The Court adds: "The foregoing facts were found at the (680) time the witness (Riggsbee) was offered, upon statement of counsel then made, who stated that he had examined said Riggsbee on the first day and knew what his testimony would be, but did not put him under subpoena till the morning of the second day, and both before and after he was put under subpoena he permitted Riggsbee to remain in the court-room without calling the attention of the Court to the fact; counsel for the prisoner stated that the witness' testimony was material, but did not state to the Court in what particular it was material or what heexpected to prove by said witness, and the objection was to the ruling of the Court in declining to allow the prisoner's counsel to examine the witness Riggsbee."
This was a mere abstract proposition, and could not be held error unless the prisoner had made known what the evidence would be. Had that been stated, and had been in anywise material, there can be no doubt the learned and just Judge who tried this case would have admitted it, notwithstanding the conduct of counsel and the undue advantage which might have been given the defense by permitting this witness to remain in the court-room during the whole trial in contempt of the order of the Court made at the instance of the defense, by which all witnesses were sent out of the court-room. At any rate, if counsel had *Page 533 
stated what he expected to prove, the question would be presented whether the defense had suffered any prejudice. It is elementary learning that the appellant must show error that prejudiced him. For all we know, the witness Riggsbee would not have given any evidence, the exclusion of which could be of any effect. Neither below, nor in this Court even, did the defense give the slightest inkling by affidavit or even a statement what it would be. He did not present it in either Court. The mere assertion that excluded evidence is material is not sufficient. The prisoner may be mistaken about it, and if so, its exclusion, even though erroneous, is not reversible rror. [error] For that reason courts have always held that the excluded evidence must be material and (681) whether it is material or not is a question of law which must be decided by the Court and not by the bare suggestion of the prisoner, or his counsel. In all the evidence Riggsbee appears only once, and then not at the scene of the homicide, but at one of three confession, and if we should surmise (for we do not know) that he would materially contradict the coroner's account of the confession made to him, there are the other two fuller confessions, not offered to be contradicted, at which Riggsbee was not present. This doubtless accounts for the Court not being told what his evidence was.
The crime of which the prisoner has been convicted, and of which the above is a condensed synopsis, was proven in all its fullness of detail. The prisoner, living separated from his wife, had a grievance about property; he buys a pistol, inquiring if it will "shoot strong," goes down to her house near midnight, effects a burglarious entrance, rouses her with her children, attacks her, and when her little children try to shelter her, drives them out of the house by flourishing his pistol, drags his wife out of bed by the heels, holds her in his left arm and shoots her, drives a neighbor off at the muzzle of his pistol, and escapes. When taken he asks, "Is she dead?" and when told that she is, replies: "Then I am satisfied." On at least three different occasions he confesses the crime and declares that he does not regret it, and that he had contemplated it for five weeks. The only evidence offered in defense is to contradict the witnesses for the State who testified that the prisoner seemed entirely sober when on his fatal errand. There is not even the usual attempt to prove insanity, nor anything tending to suggest it. We are asked to give a new trial, not for any material evidence excluded, but because the defense states that there was material evidence excluded — and that by a witness who was kept in the courtroom contrary to the order of the Court, and without the knowledge of (682) the Court. To grant such motion would seem trifling with justice. *Page 534 
The evidence must be set forth before we can hold that it was material, and therefore that its exclusion was prejudicial. In an indictment for homicide in Massachusetts it was held, upon similar facts, that the exclusion of the witness was in the discretion of the Court, though there the evidence was disclosed. Commonwealth v. Crowley, 168 Mass. 121; and same was held in S.v. Gesell, 124 Mo., 531; Whart. Cr. Ev. (9 Ed.), 446; Greenl. Ev. (16 Ed.), 432c; Holder v. United States, 150 U.S. 91; O'Bryan v. Allen, 95 Mo., 75;Jackson v. State, 14 Ind. 327; Bell v. State, 44 Ala. 393; Bird v. State,50 Ga. 589.
The conviction of the guilty and their punishment is commanded by the law. The Constitution guarantees security of life and person. This guarantee is a mockery if crime is not punished, for unless the punishment of crime deters from its commission, criminal courts with their heavy expense and consumption of time should be abolished. The sole object of a trial for murder is not the acquittal of the prisoner. It is to determine whether he is guilty or not, after giving him the advantage of requiring the unanimous verdict of a jury of twelve men, each of whom must be satisfied beyond a reasonable doubt of his guilt. There is no doubt here of the commission of the crime, of its revolting details, of the base motive, of the preparation for it, of the thinking over it, of the confessions of the prisoner. The mere assertion that a witness could have given material evidence, the purport of which was undisclosed below, and on the hearing here, can not justify a new trial.
The prisoner has been fairly tried and convicted. He gave his wife no postponement and no opportunity of defense, omitting no circumstance of horror. The law has given him nearly a year's delay, opportunity of defense, the aid of counsel, and his conviction, after a full hearing has been declared by the verdict of twelve men, beyond (683) a reasonable doubt of his guilt — and, indeed, the evidence permits of none. The evidence of the crime and the attendant horrors are beyond denial. None was attempted. There was the fullest evidence of premeditation — his going with a pistol to the house where slept his defenseless wife and children, the burglarious entrance, the threat and then the assault with a pistol, the breaking down the feeble but zealous protection of the children, who sought to protect their mother with their own bodies, the terrifying the children and driving them out, dragging his wife by the heels out of the bed, holding her up on one arm while he shot her with the other, the shooting without provocation or excuse — all this shows a deliberate purpose to kill. Besides, there was the previous declaration, when buying the pistol, and three *Page 535 
voluntary confessions of having determined on the matter long before and his gratification at accomplishing his purpose.
Riggsbee was not present at the scene of the murder, nor at the buying of the pistol, and only at one of the confessions, the least important one, that made to the coroner. The defense has not vouchsafed to lay before the courts what Riggsbee would have said, but it is clear that it could not have called in question the circumstances of the homicide and the premeditation of the prisoner. He can still lay it before the Executive. He has been "informed of the accusation against him, has confronted his accusers and witnesses with other testimony, and has had counsel for his defense." Const., Art. I, sec. 11. It is not a restriction of the above rights to require, in the discretion of the Court and in the interest of justice the regulation of the order in which witnesses shall be examined, that they shall be sworn or that they shall be sworn and sent out of the court-room before being examined. It has been a long-observed practice in the administration of justice, and on this occasion the motion was made by the prisoner. His failure to observe the order called for such steps as were necessary to enforce it. He (684) has not, however, shown that any testimony excluded would have been useful to him. With every latitude possible for the prisoner, there is a point beyond which reverence for the administration of justice forbids us to go, lest justice be wounded in the house of her friends.
No Error.